# UNITED STATES DISTRICT COURT
# DISTRICT OF NEVADA

| | |
|---|---|
| FRED HOLABIRD,<br><br>    Plaintiff,<br><br>v.<br><br>DONALD KAGIN, et. al.,<br><br>    Defendants. | 3:14-cv-00262-HDM-CBC<br><br>**REPORT AND RECOMMENDATION**<br>**OF U.S. MAGISTRATE JUDGE** |

This Report and Recommendation is made to the Honorable Howard D. McKibben, United States District Judge. The action was referred to the undersigned Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and LR IB 1-4.

Currently pending before the court is Plaintiff Fred Holabird's Motion for Evidentiary Hearing to Enforce Settlement Agreement, (ECF No. 197)[1], and Defendant Donald Kagin's Cross-Motion to Enforce Settlement Agreement. (ECF 208). Following full briefing of these competing motions, the court held an evidentiary hearing on July 11 and 12, 2018 (ECF Nos. 210, 212). For the reasons set forth herein, the court recommends Plaintiff's Motion (ECF No. 197) be granted, and Defendant's Cross-Motion (ECF No. 208) be denied. The Court further recommends that judgment be entered in favor of Plaintiff, as stated in this report and recommendation.

## I.    FACTUAL FINDINGS

1.    Plaintiffs Fred Holabird and Robin Holabird filed a Complaint against Donald H. Kagin, et al., in the Second Judicial District Court of the State of Nevada in and for Washoe County on April 15, 2014. (Transcript of Evidentiary Hearing, July 11-12, 2018,

---

[1] This motion was granted, in part, by the Court's Minute Order setting an evidentiary hearing. (ECF No. 205). However, to the extent the motion sought the enforcement of the settlement agreement, this aspect of the motion remains outstanding.

p. 14, lines 1-5.)[2] On April 18, 2014, Plaintiff filed an Amended Complaint. The Amended Complaint alleges, among other things: breach of contract, misrepresentation/fraud, conversion, civil conspiracy, and racketeering arising out of the breakup and dissolution of a company owned by Defendant Don Kagin and known as Holabird Kagin Americana Inc. ("HK" or, sometimes, "HKA") and with which Plaintiff had been employed for in excess of eight (8) years. (Amended Complaint.) (Plaintiffs and Defendants are generally referred to herein as, the "Parties.")

    2.    The case was removed by Defendants to the United States District Court, District of Nevada, Reno, on May 21, 2014. (ECF No. 1; T. p 15, lines 2-4.)

    3.    After removal to the United States District Court, the Parties litigated for some two and one-half (2½) years, engaging in extensive motion practice and discovery, including the production of thousands of documents, numerous depositions, interrogatories, and the like. (T. p. 15, lines 5-15.)

    4.    On December 12 and 13, 2016, the Parties engaged in settlement negotiations before Magistrate Judge Valerie P. Cooke. On December 13, 2016, the Parties agreed to a settlement. (Plaintiff's Exhibit 1.)

    5.    On December 13, 2016, the Parties put the terms of the Settlement Agreement on the record before Judge Cooke. (Plaintiff's Exhibit 1.)

    6.    On February 3, 2017, the Parties executed a written Settlement Agreement ("SA"). (Plaintiff's Exhibit 2.) Following the execution of the SA, the court entered an order granting the parties' stipulation for dismissal of this matter with prejudice. (ECF No. 186). In this order, the court specifically ordered that "the settlement among the parties is a reasonable compromise and that the United States District Court for the District of Nevada shall retain jurisdiction over the parties to enforce the terms of the Settlement Agreement." (*Id.*, p. 2).

---

[2] Citations to this Transcript will be noted as "T." only. All references to exhibits refer to those exhibits that were submitted during the July evidentiary hearing.

2

7.     On March 14, 2018, Plaintiff filed a Motion to Enforce Settlement Agreement (ECF No. 187.) After Defendants filed their Opposition (ECF No. 190), this Court ordered the Parties to meet and confer in a good faith attempt to resolve their differences. (ECF No. 193.) Although the parties conducted this meet and confer, no resolution could be reached.

8.     On May 10, 2018, Plaintiff filed a second Motion for Evidentiary Hearing to Enforce Settlement Agreement. (ECF No. 197.) In this document, Plaintiff requested the Court hold Defendants in default of the SA and to enter a judgment accordingly. Defendant filed a response, (ECF No. 198), and Plaintiff replied. (ECF No. 199).

9.     Thereafter, Judge Cooke ordered a status conference to be held on June 25, 2018. (ECF No. 202.) During the status conference, Plaintiff's Motion for Evidentiary Hearing was granted, to the extent it requested an evidentiary hearing. The hearing was set for July 11 and 12, 2018. (ECF No. 205). The Court further advised counsel that the Court does not normally retain jurisdiction over Settlement Agreements, but that the Court would make an exception in this case because the parties may have been confused as to that position and because the SA provided, in Section 6: "With the Court retaining jurisdiction to enforce this Agreement and resolve any disputes that may arise out of this Agreement."

10.    Also, on February 3, 2017, the same date the SA was executed, the parties executed a Stipulation and Confession of Judgment. (Defendants' Exhibit 1.) The Confession of Judgment anticipated the submission of declarations upon default and provided: "The Court may enter judgment in favor of Plaintiff and against Defendants for the outstanding amount owed under the financial terms set forth in Paragraph Nos. 1 and 2 (SA Sections 8, 9, and 10) …"

11.    The SA provides, in Section 8, that Defendants will pay Plaintiff $100,000.00, with $35,000.00 to be paid at the time of execution and delivery of the Agreement, and the balance of $65,000.00 to be paid on or before April 30, 2017. Defendants complied with this part of the SA. (T. p. 22, lines 13-21.)

12. The SA provides, in Section 9.1, that Defendants will pay Plaintiff the sum of $150,000.00 in twelve equal monthly installments of $12,500.00 each, beginning one year from the date of the Agreement, which payments are subject to credits as set forth in Section 9.2. The first payment under this provision was due on February 3, 2018.

13. Pursuant to Section 9.2 of the SA, Defendants were to provide to HWAC (Plaintiff's Western Americana auction company) $200,000.00 of Americana previously owned by HK and purchased by Plaintiff when he was an employee of HK, at the prices Plaintiff paid for the items while an employee of HK. (T. p. 24, lines 3-15.) Defendant Kagin originally argued that "Holabird Cost" also meant any item sold by HK at retail. (Kagin Declaration, ECF 191, at p. 8, ¶ 26), but later admitted under cross examination that "Holabird Cost" only included items sold by Holabird to HK when Defendant Kagin acquired Holabird's company and items purchased by Holabird on behalf of HK while employed by HK (T. p. 458, lines 2-17).

14. Section 9.2 of the SA does not provide a time by which Defendants must deliver the $200,000.00 in Americana, although Plaintiff testified that it was his understanding that the material would be supplied immediately after execution of the SA. (T. p. 24, lines 17-22.) Defendant Kagin, who negotiated the SA, did not testify as to his expectations or understanding as to when the $200,000.00 in Americana was to be delivered.

15. At the time of the evidentiary hearing, Plaintiff contended that Defendants still had not delivered $200,000.00 in Americana previously owned by HK and purchased by Plaintiff while employed by HK, some seventeen (17) months after execution of the SA. (T. p. 24, lines 23-25.) Plaintiff testified that no more than $60,000.00 had been received over the course of 2017 and 2018, through six (6) shipments spread over this time period, and probably less than $60,000.00. (T. p. 25, lines 1-9; p. 29, lines 12 through p. 30, line 8.) In fact, Plaintiff's calculations show a total of $43,156.00 worth of the Americana received. (Plaintiff's Exhibit 5; T. p. 57, line 7 through p. 66, line 15.) Defendant Kagin testified that he believes he has sent at least $150,000.00 worth of Americana previously

purchased by Plaintiff while employed by HK, and possibly $200,000.00 worth at HK costs. (T. p. 412, lines 3-10).

16. Plaintiff testified that he went through the Kagin inventory highlighting, in different colors, items on the inventory that were: (1) not owned by HK but, rather, were owned by Don Kagin, his father, Dr. Awerbuch, or others; (2) items that had been overvalued by Defendants, stating retail rather than the wholesale prices paid by HK; (3) tokens that had been valued as if they had been "graded" by a professional grading company, when they had not, which added $11.00 in value to each token otherwise valued at $1.00; (4) material that had been dropped off that was not on either inventory or was valued at $0.00 on the Kagin inventory; and (5) $27,000.00 worth of mining books that were on the Kagin inventory but never received by Plaintiff. (Plaintiff's Exhibit 5; T. p. 30, line 9 through p. 34, line 3).

17. Defendant Kagin admits that some of the material was owned by himself or his father and that some of the material had been owned by Dr. Awerbuch and was not material that had been purchased by Plaintiff while he worked for HK or was priced at retail prices in the inventory. (Plaintiff's Exhibit 12; T. p. 456, lines 5-15; p. 459, line 5 through p. 463, line 21.)

18. Defendant Kagin admits that he has no proof that the tokens that he claims were graded were in fact graded, other than his recollection from seven years ago. (T. p. 469, line 14 through p. 470, line 14.)

19. Plaintiff testified that he would not have had the tokens graded, even if they had been owned by HK when he worked for HK, because they were of such low value that no third-party grading company would have graded them (T. page 35, line 14 through p. 41, line 10.)

20. Plaintiff also testified that none of these tokens were in the plastic boxes issued by the grading company certifying that they were graded, such as depicted in Plaintiff's Exhibit 29. (*Id.*)

21. Defendants did not produce any evidence that the $27,000.00 worth of mining books had ever been delivered to Plaintiff. (T. p. 470, line 14 through p. 471, line 23.)

22. Section 9.2 of the SA also provides that HWAC (Plaintiff) will auction the $200,000.00 in Americana in a reasonable manner and will retain from the auction proceeds a buyer's premium of 21% and will also retain 7.5% of the hammer price of each item. The remaining auction proceeds are to be applied in the following order: first to pay Plaintiff $25,000.00 and second to pay Plaintiff the $150,000.00 obligation set forth in Section 9.1, and to offset Defendants' obligation to pay the $150,000.00 in installment payments of $12,500.00 commencing one year from the date of the SA. Section 9.2 further provides that Defendants will supply the material with an inventory. Later in Section 9.2, it provides that Plaintiff will provide a report of "material sold, the venue and manner of sale, the prices realized, the proceeds paid to Mr. Holabird, and the proceeds credited against the $150,000.00" identified in Section 9.1.

23. Plaintiff provided Defendants with the reports required by the SA within forty-five (45) days of each auction as further required by the SA. (T. p. 124, line 25 through p. 125, line 2; Plaintiff's Exhibit 8 and 9). Those reports indicate the material sold, the venue and manner of sale, the prices realized, the proceeds paid to the Plaintiff and the proceeds credited against Defendants' $150,000.00 obligation, as required by the SA. (T. p. 123, line 16 through p. 124, line 24.) These reports indicate that the first $25,000.00 to be paid to Plaintiff from the proceeds of the auctions had not been completely paid down by February 3, 2018, one year from the date of the SA, and that $9,598.75 was still owing on the first $25,000.00. (Plaintiff's Exhibit 8, p. 1.) As of February 3, 2018, the reports indicate that none of the $150,000.00 had been offset. (Plaintiff's Exhibit 8, p. 1). The reports indicate that it was not until after the March 18, 2018, auction that enough auction proceeds had been generated to offset any of the $150,000.00. As of the time of the evidentiary hearing, the $150,000.00 had been offset by only $6,601.53, leaving a total owing of $143,309.47 (Plaintiff's Exhibit 8, p. 1).

24. Plaintiff testified that Defendants failed to make the February 3, 2018, monthly payment of $12,500.00 as provided in the SA and that Defendants had failed to make the payments every month thereafter up until late the Friday before the Evidentiary Hearing, when Plaintiff's counsel received a check from Defendants delivered by Defendants' counsel in the amount of $70,150.15 purportedly for payments not made on February 3, 2018, March 3, 2018, April 3, 2018, May 3, 2018, and June 3, 2018. (T. p. 22, line 22 through p. 23, line 17). Defendant Kagin does not deny that he failed to make the $12,500.00 monthly payments, but testified that he did not make the payments because he thought Plaintiff's accounting was faulty, and he did not have a full accounting. (T. p. 492, line 16 through 493, lines 2-6.) Defendant Kagin admits sending the check for $70,150.15 late on the Friday before the evidentiary hearing. (T. p. 492, line 16 through p. 493, line 15.) Yet he testifies that he sent the check for $70,150.15 even though he still contends that he did not have a full accounting. (*Id.*).

25. Pursuant to the SA, Plaintiff gave Defendants notice in writing that Defendants were in default under Section 9.1 and 9.2 of the SA. (Plaintiff's Exhibits 4 and 11.)

26. Although auctions were held throughout 2017 and Defendants received consignor reports after each auction indicating what had been sold and what had been paid to Plaintiff and what had been credited to the $25,000.00 owed and the $150,000.00 owed, Defendants had never complained about the reports as being inadequate or that there were any problems with the accountings reported until the Defendants first $12,500.00 payment was due on February 3, 2018. (T. p. 347, lines 7-16; T. p. 455, line 8 through p. 456, line 4; T. p. 346, line 22 through p. 347, line 16.)

27. Defendants contend that Plaintiff did not auction their material in a reasonable fashion, did not conform Plaintiff's accountings and reports to Defendants' inventory that was supplied with his counsel's letter of February 9, 2018, that Plaintiff collected a "buyer's premium" in excess of the 21% provided for in the SA, that HWAC allowed employees to purchase items of Defendants at the auctions, and that Plaintiff may

1 | have charged some consignors a lower rate than charged to Defendants in contravention
2 | of Section 10 of the SA. (Plaintiff's Exhibit 19.)

3 |     28.    Section 10 of the SA requires Defendants to deliver to Plaintiff and HWAC an additional $1.5 million of consignment material over a period of eighteen (18) months from the date of the SA. This material was to be sold by Plaintiff and HWAC in the auctions and Plaintiff was to retain certain amounts charged to buyers and sellers depending on the dollar amount or the nature of the material and the dollar amount of sales. For numismatics, HWAC's consignment fee was to be 15% or the lowest rate charged to dealer consignors in that particular auction and the buyer's premium was to be 17% to 17.5%. For non-numismatic items, HWAC's consignment fee was to be 15% for items that sell for $1,000.00 or more, 20% for items that sell for an amount between $500.00 and $1,000.00, and 25% for items that sell for less than $500.00. The buyer's premium for non-numismatic items, which was to be retained by HWAC, was to be 21%. As of the date of the Evidentiary Hearing, seventeen (17) months after the execution of the SA, Defendants have only delivered a small amount of consignment material pursuant to Section 10 that has a sale value of approximately $22,000.00. (Plaintiff's Exhibit 8.)

    29.    Plaintiff conducted auctions throughout 2017 and Defendants never complained to Plaintiff, orally or in writing, about depressed prices, auction irregularities, accountings, or about any of the other complaints raised in Defendant's Declaration dated April 4, 2018 (Plaintiff's Exhibit 19) prior to the time that Defendants' first payment of $12,500.00 was due on February 3, 2018. (T. p. 135, lines 10-24; T. p. 455, line 8 through p. 456, line 4.)

    30.    Defendant Kagin admitted that he made no such complaints. (*Id.*)

    31.    The SA requires that an inventory be provided with the material delivered, but the SA does not require that Plaintiff do anything affirmative with the inventory. The SA does not require that Plaintiff issue consignor reports that somehow tie in with Defendants' inventory. Plaintiff requested the inventory in the settlement negotiations in

1  case, at some later point, there was an issue with regard to any alleged missing items. (T.
2  p. 27, line 22 through p. 28, line 6.)

3      32.    Plaintiff testified that HWAC makes its own inventory, that HWAC does not
4  use the consignor's inventory in any instance, that no auction companies Plaintiff is aware
5  of use a consignor's inventory for reporting purposes and that HWAC reports sales based
6  on its own inventory created at the time the items are lotted and put in the auction. (T. p.
7  28, line 10 through p. 29, line 6.)

8      33.    Defendants' expert witness, Andrew Lustig, confirmed that most auction
9  companies, even numismatic auction companies, do not use the consignor's inventory in
10 placing items in an auction or in describing or reporting for the auction. (T. p. 299, line 13,
11 through p. 300, line 12.)

12     34.    Defendants' inventory is dated February 7, 2018, and the first time Plaintiff
13 would have seen the inventory was after February 7, 2018, a little after Defendants' first
14 $12,500.00 installment was due. (T. p. 26, line 18 through p. 27, line 5.)

15     35.    Plaintiff testified that Defendants' 125-page inventory was unusable in that it
16 was in no order and items delivered could not be identified by the inventory. In addition
17 to items overvalued on the inventory and items that were not purchased by HK that were
18 delivered to Plaintiff, the inventory had hundreds of items that were inadequately
19 described so that Plaintiff could not tell what the item was from the inventory. Defendants
20 dumped thousands of next-to-worthless tokens on HWAC delivered in four (4) large boxes
21 with no separate inventory, and bags of tokens and circulating Israeli coins were merely
22 dumped into boxes with no organization whatsoever. Plaintiff testified that he went
23 through most of the boxes and could find nothing of any real value and that it would be an
24 economic impossibility to inventory the items individually and list them in an auction
25 catalogue. In addition, Jim Vallier, a helper to Defendants, delivered sixty (60) boxes of
26 material containing mostly low value items with no inventory whatsoever. Nothing in the
27 sixty (60) boxes was inventoried by Defendants and nothing in the sixty (60) boxes is on
28 Defendants' 125-page inventory. Defendants' 125-page inventory, along with being in no

discernable order, was not even paginated. (T. p. 41, line 17 through p. 89, line 11; T. p. 119, lines 6-14; T. p. 158, lines 4-18.) Not even Defendant Kagin could find an item on the 125-page inventory. (T. p. 453, line 19 through p. 455, line 7.) Defendant Kagin did not ship everything on the 125-page inventory, even though he claimed to have done so. (T. p. 79, line 3 through p. 80, line 23.)

36. Plaintiff is an established auctioneer and HWAC is an established auction company that does live and on-line auctions that, at its last auction, had over 3,700 registered bidders. (T. p. 125, line 3 through p. 126, line 7.) In addition, Plaintiff is an expert in Americana having written several books on the subject and has been preparing auction catalogues for Americana auctions since 1983. (T. p. 117, line 4 through p. 119, line 5.) Even Defendants' expert, Ronald Karp, opined that Plaintiff's catalogues were very professional and he had no problems with them. (T. p. 268, lines 8 – 15.) The items to be auctioned are described, in many cases photographed, and the auction catalogue is sent to all prior buyers and prospective buyers. (T. p. 117, line 4 through p. 119, line 5.)

37. Plaintiff could not auction the low-end tokens that could not economically have been individually described and photographed except in "grab bags," as was done. (T. p. 142, line 15 through p. 145, line 7.) Only a few grab bags sold, amounting to a couple of hundred dollars in auction proceeds. (*Id.*) At least 97% of the low-end tokens and shekels remain unsold and can be returned to Defendants. (T. p. 144, line 18 through p. 145, line 2.) While Defendant put on two experts on the subject of selling items in grab bags, neither expert saw the low-end items that Defendants delivered to Plaintiff. (T. p. 275, line 11 through p. 276, line 4; T. p. 302, lines 14-18.)

38. Plaintiff's expert, Jeffrey Shevlin, testified that he looked at the low-end material that Defendants had dumped into boxes and delivered to Plaintiff and concluded that it was just a bunch of junk. (T. p. 401, line 17 through p. 403, line 3.) Plaintiff's other expert, David Bowers, testified that he looked at a picking ticket (that was admitted as Plaintiff's Exhibit 25) that included low-end tokens and phone cards and concluded that it

1  was junk and that most auction companies would not agree to auction the material.
2  (Bowers deposition p. 14, line 23 through p. 16, line 13.)

3  39. Defendant Kagin was the owner of HK prior to its break-up in 2014. (T. p.
4  475, lines 1-4.) The auction procedures employed by Plaintiff and HWAC, as well as
5  inventorying and cataloguing, were developed at HK and were identical to those auction
6  procedures and consignor reports utilized by HK. (T. p. 339, lines 4-11.) Defendant Kagin
7  could not remember what the reports looked like when he owned and ran HK, but he did
8  testify that they were probably similar to HWAC's. (T. p. 475, lines 5-15.)

9  40. Plaintiff allowed Defendants to audit the records of HWAC as to the items
10 delivered and sold by HWAC of all Kagin material for all auctions. (Plaintiff's Exhibit 31.)
11 The auditor employed by Defendants had no prior experience auditing or even interacting
12 with an auction company. (T. p. 350, lines 15-20.) Nevertheless, the auditor found no
13 inconsistencies or inaccuracies in the consignor reports given to Defendant Kagin after
14 every auction. (Plaintiff's Exhibit 31.) The SA does not preclude employees of HWAC
15 from bidding on auction items of Defendants, and total employee purchases amounted to
16 only $225.00 for all auctions. (Plaintiff's Exhibit 13; T. p. 187, line 19 through p. 189, line
17 19.) The auditor included as an exhibit to her report a list of employees that had purchased
18 items at the auctions. The list that she attached included all items purchased by all
19 employees of all material consigned by all consignors and not items purchased by
20 employees of just material supplied by Defendants. (T. p. 353, line 15 through p. 355, line
21 2.) The auditor was shown all consignor reports for every auction and could confirm that
22 no consignors received a better rate than Defendants. (T. p. 355, lines 12-23.)

23 41. The buyer's premium of 21% for the Americana is collected from the buyer
24 and has nothing to do with Defendants. Defendants are not charged the buyer's premium.
25 (T. p. 101, lines 1-6). HWAC adds on 3% if the buyer uses a credit card or pay pal. This
26 is a pass-through amount that goes to the bank and not to HWAC. (T. p. 100, lines 5-25).
27 HK also added on 3% to its buyer's premium for credit card and pay pal purchases when
28 Defendant Don Kagin owned and was the President of HK. (T. p. 100, lines 12-25; T. p.

11

476, line 20 through p.477, line 12). Defendant Kagin was aware of this because it is published in each auction catalogue was sent to Defendant Kagin before each auction. (T. p.176, line 18 through p. 178, line 18). HWAC does not charge the additional 3% if the buyer pays in cash. (T. p. 176, line 12 through p. 177, line 1). In 2018, HWAC increased its buyer's premium to 22%. The settlement, as put on the record, provides that HWAC will retain its usual buyer's premium. (Exhibit 1, p. 16, lines 11-16). Defendant Kagin could not remember whether he had agreed to that provision during the settlement negotiations. (T. p. 482, lines 6-23.)

42.  Brook Maylath is a consultant to Plaintiff and HWAC. Ms. Maylath has a Master's in Business Administration and has been doing business development and strategic planning for the health industry in Nevada for many years. (T. p. 344, lines 10-18.)

43.  Ms. Maylath did certain calculations to determine damages for Defendants' alleged breach of the SA. Ms. Maylath has used a similar approach or methodology in evaluating business ventures in the health care industry. (T. p. 360, line 11 through p. 361, line 4). Ms. Maylath did three different scenarios: a high calculation, a medium calculation and a low calculation, showing what HWAC would make from the $1.5 million in consigned goods, had they been delivered. In order to come up with these figures, it was necessary for Ms. Maylath to assume how much of the material supplied would be high-level Americana (which has one rate for buyer's premium and seller's fee) and what the mix would be for numismatic items (because for numismatics there are four different consignor rates depending on the value of the goods sold). These calculations are shown in Plaintiff's Exhibit 23.

44.  In the low calculation (Exhibit 23, Table 1), Ms. Maylath weighted numismatics, which have a lower rate-of-return to HWAC than Americana, very heavily at 85% and only 15% for the higher commissioned Americana. Ms. Maylath also assumed 5% of non-numismatic material greater than $1,000.00, 5% of material less than $1,000.00 but greater than $500.00, and 5% of non-numismatic material less than $500.00. The net

value to HWAC for selling the $1.5 million under this scenario would be $351,275.63, after deducting appropriate expenses calculated at 10%.

45. In the middle scenario (Plaintiff's Exhibit 23, Table 3), Ms. Maylath assumed that 25% of the consigned goods would be in each of the four different categories, i.e., non-numismatics less than $500.00, non-numismatics between $500.00 and $1,000.00, non-numismatics above $1,000.000, and numismatics. The middle figure that HWAC would have made off the sale of the $1.5 million is $426,628.13 after deducting expenses.

46. In the high range scenario, the inputs have been changed to assume 80% of the consigned goods would be non-numismatic valued at less than $500.00, 10% between $500.00 and $1,000.00, 5% greater than $1,000.00, and 5% numismatic. The high figure comes to $507,151.88 after deducting expenses.

47. The first page of Plaintiff's Exhibit 23 shows the total damages in each category after adding in $143,309.47, the amount still owing under Section 9 after deducting the amount offset against the $150,000.00 owing under Section 9, and lost premiums on $25,000.00 of Americana that was never delivered. (T. p.359, line 23 through p. 365, line 21). Once those amounts are added in, the three damage scenarios are:  low - $499,210.10, middle - $574,562.60, and high - $655,086.35. These figures do not include any offset for the payment sent by Defendant Kagin to Plaintiff prior to the evidentiary hearing in the amount of $70,150.15.

48. Plaintiff was concerned because Defendant Kagin was supplying goods that he knew belonged to Dr. Awerbuch, a good client of Defendant Kagin's at HK. Plaintiff's Exhibit 16 is Dr. Awerbuch's Plea Agreement in the United States District Court, Eastern District of Michigan. Plaintiff knew that Dr. Awerbuch had been under federal indictment for several years for Medicare fraud and prescribing great quantities of opioids and that the federal government was confiscating his property. Plaintiff was concerned that, by selling material delivered by Defendants that he knew to be Dr. Awerbuch's material, he might be involved in some sort of fraud. Plaintiff made requests of Defendants to show proof of ownership or agency to sell the material, but Defendants refused. Defendant

1  Kagin thought it was none of HWAC's business who owned the material. (T. p. 161, line
2  7 through p. 164, line14; T. p. 462, line 14 through p. 463, line 21.) At the evidentiary
3  hearing, Defendant Kagin could not produce a bill of sale for the Awerbuch material and
4  had conflicting statements as to whether he owned the material or Dr. Awerbuch owned
5  the material. (T. p. 459, line 5 through p. 463, line 21.)

**II.     LEGAL ANALYSIS**

   A.     <u>Jurisdiction</u>

First, this Court has jurisdiction over the subject matter of this action as well as personal jurisdiction over the parties to this proceeding. Under the doctrine of ancillary jurisdiction, a federal court maintains jurisdiction "over some matters (otherwise beyond their competence) that are incidental to other matters properly before them." *K.C. ex. Rel. Erica C. v. Torlakson*, 762 F.3d 963, 966 (9th Cir. 2014) (quoting *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 378 (1994)). One of these purposes is "to enable a court to function successfully, that is, to manage its proceedings, vindicate its authority, and effectuate its decrees." *Id.* In the case of settlement agreements, the court retains ancillary jurisdiction over the enforcement of such agreements if the order of dismissal contains a provision indicating that the court will "retain jurisdiction" over the agreement. *K.C.*, 762 F.3d at 967. That is exactly the case here. In the order of dismissal, the court expressly stated that "the settlement among the parties is a reasonable compromise and that the United States District Court for the District of Nevada shall retain jurisdiction over the parties to enforce the terms of the Settlement Agreement." (ECF No. 186). Therefore, this Court has ancillary jurisdiction to enforce the settlement agreement in this case.

   B.     <u>Enforcement of Settlement Agreements</u>

Settlement agreements are governed by the law of the forum state. *United Commercial Ins. Serv. Inc. v. Paymaster Corp.*, 962 F.2d 853, 856 (9th Cir. 1992). Under Nevada law, a settlement agreement is a contract and general contract principles govern the interpretation and enforcement of such agreements. *May v. Anderson*, 121 Nev. 668, 672, 119 P.3d 1254, 1257 (2005). A contract is valid and enforceable under Nevada law

if there has been "an offer and acceptance, meeting of the minds and consideration." *Id.* In this case, there is no dispute between the parties over whether the settlement agreement is a valid and enforceable contract. Rather, the dispute in this case centers upon whether Defendants breached the agreement, and if so, what remedy should be imposed.

Under Nevada law, breach of contract is a material failure of performance of a duty arising under or imposed by an agreement. A breach of contract claim requires: (1) the existence of a valid contract; (2) a breach by the defendant; and (3) damage as a result of the breach. *Contreras v. American Family Mutual Insurance Company*, 135 F.Supp.3d 1208, 1224 (D. Nev. 2015). Total breach of a contract is a breach that so substantially impairs the value of the contract at the time of the breach that the circumstances allow the non-breaching party to recover damages based on all of their remaining rights to performance. *Mobil Oil Exploration and Producing Southeast, Inc. v. U.S.*, 530 U.S. 604, 120 S.Ct. 2423, 147 L.Ed.2d 528 (2000); *Restatement (Second) of Contracts*, Section 243. Here, the Court finds that Defendants materially breached the settlement agreement. First, the SA provides, in Section 9.1, that Defendants will pay Plaintiff the sum of $150,000.00 in twelve equal monthly installments of $12,500.00 each, beginning one year from the date of the agreement, which payments are subject to credits as set forth in Section 9.2. However, Defendants defaulted under the terms of the SA when they failed to make the first $12,500.00 payment due on February 3, 2018, pursuant to Section 9.1. Plaintiff properly put Defendants on notice of the default on February 6, 2018, and February 13, 2018. Defendants continued to default with their failure to make each and every monthly payment of $12,500.00 thereafter through June of 2018. The defaults were material defaults. Defendants' delivery of a check in the amount of $70,150.15 the Friday evening prior to the evidentiary hearing conducted on July 11 and 12, 2018, does not undo or nullify these prior defaults. The Court specifically rejects Defendants' contentions that the Court should order that Plaintiff accept the check in the amount of $70,150.15 and that the parties be ordered to continue their relationship.

In addition, Defendants failed to supply Plaintiff with $200,000.00 worth of Americana based on prices paid by Plaintiff when he was an employee of HK pursuant to Section 9.2 of the agreement, which also constituted a breach. Section 9.2 of the SA provided that Defendant would provide Plaintiff with $200,000.00 in Americana items owned by HK, along with an inventory. Upon receipt of the Americana, HWAC (Plaintiff) would, in turn, auction in a reasonable manner. Per the terms of the SA, Plaintiff would retain from the auction proceeds a buyer's premium of 21% and 7.5% of the hammer price of each item. The remaining auction proceeds were to be applied in the following order: first to pay Plaintiff $25,000.00 and second to pay Plaintiff the $150,000.00 obligation set forth in Section 9.1, and to offset Defendants' obligation to pay the $150,000.00 in installment payments of $12,500.00 commencing one year from the date of the SA. Later in Section 9.2, it provides that Plaintiff was to provide a report of "material sold, the venue and manner of sale, the prices realized, the proceeds paid to Mr. Holabird, and the proceeds credited against the $150,000.00" identified in Section 9.1.

The evidence shows that Defendants included items that were not previously owned by HK, items that were owned by third-parties, items that were overpriced by Defendants and that, all totaled, Defendants only supplied approximately $43,000.00 worth of Americana that had previously been owned by HK and purchased by Plaintiff or had been sold to HK by Plaintiff when Defendant Kagin acquired Plaintiff's business in 2008. Failure to deliver the $200,000.00 in prior-owned HK Americana was a separate breach of the SA. Although the SA does not provide when the Americana was to be delivered, a normal interpretation is that it would be delivered within a reasonable time after execution of the SA. Plaintiff testified that his understanding was that it would be delivered in one shipment shortly after execution. Defendants did not testify as to their understanding. The fact that the entire $200,000.00 still has not been delivered some seventeen (17) months after execution of the SA is unreasonable and is a material breach of the contract.

None of Defendants' explanations for not complying with the contract are reasonable or believable. All of Defendants claims in defense are either such small sums as to not be material (such as Plaintiff adding on a 3% pass-through charge for credit cards on the buyer's premium, or that certain employees purchased items out of the auctions belonging to Defendants, or that Plaintiff sold a few hundred dollars of low end material in "grab bags") or were unsupported by any credible evidence.

Defendants were unable to show that Plaintiff had conducted the auctions in an unreasonable manner or that the manner of conducting the auctions depressed prices of Defendants' materials. On the contrary, the credible evidence showed that Plaintiff was a leading auctioneer and auction company that conducted auctions in a meticulous manner, just as they had always been conducted, even when Plaintiff was an employee of HK, a company owed and managed by Defendant Kagin. The evidence showed Defendants never complained about accountings, reports, auction procedures, methods of conducting the auctions, employees purchasing items in the auctions, the amount of the buyer's premium or anything else until one year after the SA had been signed, several auctions had been conducted and reported on, and Defendants' first payment of $12,500.00 was due, which further strains credulity. In sum, Defendants materially breached the settlement agreement.

Pursuant to the election of remedies doctrine, in the case of a continuing contract, upon learning of a breach, a party must choose between terminating the contract and suing for damages or continuing the contract and suing for damages. Said another way, when a party materially breaches a contract, the non-breaching party may choose to continue to perform the contract or may refuse to continue and terminate the agreement. *Starlite Aviation Operations, Ltd. v. Erickson, Inc.*, 2015 WL 2367998 (D. Oregon 2015); *Times Mirror Magazines, Inc. v. Field & Stream Licenses Co.*, 103 F.Supp.2d 711, 736 (S.D.N.Y. 2000). In this case, Plaintiff has elected to terminate the contract and sought damages by way of an evidentiary hearing and to reduce those damages to a judgment.

Damages for a breach of contract should be awarded in an amount that will make the aggrieved party whole and to place them in the position they would have been in had the contract not been breached. *Rd. & Highway Builders v. N. Nev. Rebar*, 284 P.3d 377, 382 (Nev. 2012). There must be sufficient evidence provided to allow the court to reasonably calculate an accurate amount of damages. *Countrywide Home Loans, Inc. v. Thitchener*, 192 P.3d 243, 248 (Nev. 2008). Here, Plaintiff presented sufficient evidence to provide a reasonable approach to calculate the damages for Defendants' breach of the SA. Plaintiff presented three (3) different scenarios for damages: a low range, a middle range and a high range. Plaintiff's assumptions were reasonable and damages are not speculative. The Court selects the low range, in the total amount of $499,210.10, as the appropriate calculation of damages.[3]

### III.     CONCLUSION

For good cause appearing and for the reasons stated above, the court recommends that Plaintiff's Motion for Evidentiary Hearing to Enforce Settlement Agreement be granted, (ECF No. 197), and Defendants' Cross-Motion to Enforcement Settlement Agreement be denied (ECF No. 208).

1.     Pursuant to 28 U.S.C. § 636(b)(1)(c) and Local Rule IB 3-2, the parties may file specific written objections to this Report and Recommendation within fourteen days of receipt. These objections should be entitled "Objections to Magistrate Judge's Report and Recommendation" and should be accompanied by points and authorities for consideration by the District Court.

---

[3] This amount does not include an offset for the $70,150.15 payment sent by Defendant Kagin on the eve of the evidentiary hearing nor does it include any offsets for any subsequent payments sent following the evidentiary hearing. Plaintiff may choose whether to retain those payments and apply them toward the outstanding judgment or to return the payments to Defendants. Plaintiff shall, however, return to Defendants any goods or items received prior to or after the evidentiary hearing that have been held by Plaintiff pending the Court's resolution in this case.

2. This Report and Recommendation is not an appealable order and any notice of appeal pursuant to Fed. R. App. P. 4(a)(1) should not be filed until entry of the District Court's judgment.

**IV.   RECOMMENDATION**

**IT IS THEREFORE RECOMMENDED** that Plaintiff's Motion for Evidentiary Hearing to Enforce Settlement Agreement (ECF No. 197) be **GRANTED,** and Defendant's Cross-Motion to Enforcement Settlement Agreement (ECF No. 208) be **DENIED**;

**IT IS FURTHER RECOMMENDED** that the court enter judgment in this case in favor of Plaintiffs and against Defendants, jointly and severally, in the total sum amount of **$499,210.10**.

**DATED**: December 18, 2018.

_____
**UNITED STATES MAGISTRATE JUDGE**